*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-SP-0003

CAMEROON WHITERU, *et al.*, APPELLANTS,

V.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, APPELLEE.

On Certified Question from the United States Court of Appeals
for the District of Columbia Circuit
(22-7154)

(Argued September 24, 2024                    Decided November 20, 2025)

*Andrew D. Levy* for appellants.

*Pratik A. Shah* for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER, *Associate Judge* and EPSTEIN,[*] *Senior Judge, Superior Court of the District of Columbia*.

BLACKBURNE-RIGSBY, *Chief Judge*:  This case is before the court on a certified question from the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit).  The D.C. Circuit seeks clarification of District of

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a).

Columbia law as it relates to a negligence and wrongful death action against the Washington Metropolitan Area Transit Authority (WMATA), appellee here. Appellants are the parents and the estate of Okiemute C. Whiteru, who suffered severe injuries and death after he accidentally fell behind a parapet on the platform at the Judiciary Square Metro Station.

## I. Certified Question of Law and Short Answer

### A.    The Certified Question

Pursuant to D.C. Code § 11-723, the United States Court of Appeals for the District of Columbia Circuit has certified the following question to this court:

> Under District of Columbia law, and under the facts described, may a plaintiff who, as a passenger located on a common carrier's station platform, involuntarily falls backward from the station platform into a non-public area immediately adjacent to the station platform, and from the impact of such fall sustains immobilizing injuries, recover for the exacerbation of those injuries attributable to the common carrier's failure to aid him, if the common carrier knew or had reason to know of his injuries?

### B.    The Short Answer

As we explain more fully below, the answer to the question is yes, with an explanation. In short, if a passenger accidentally or otherwise involuntarily falls

backwards into a non-public area, the passenger will generally become a trespasser. If the common carrier knows or has reason to know of the trespasser's presence and injured, trapped, or otherwise imperiled status, the common carrier has both a duty of ordinary care to not cause harm to the trespasser and a duty to provide reasonable affirmative aid. The exact duties a common carrier has in this situation will be fact-specific.

Generally, a passenger can become a trespasser by entering a non-public area, even if the entry was accidental or unintentional. In such a situation, the special affirmative duty to passengers outlined in Restatement (Second) of Torts § 314A would not apply to the passenger-turned-trespasser. However, a "known" trespasser is entitled to the exercise of care such that a common carrier or land possessor must use ordinary care to avoid injuring the trespasser or exacerbating previously incurred injuries. Additionally, a known trespasser in a trapped, injured, or otherwise imperiled position is entitled to a reasonable affirmative duty to aid. The common carrier or land possessor must know, or have reason to believe from facts within its knowledge, that a trespasser is present. Otherwise, a common carrier generally owes an undiscovered trespasser only a duty to refrain from willfully or wantonly injuring him or her.

## II. Background

We repeat the facts set forth in the D.C. Circuit opinion certifying the question to us. *See Whiteru v. Washington Metro. Area Transit Auth.*, 89 F.4th 166, 168 (D.C. Cir. 2023) (*Whiteru II*). On October 19, 2013, at around 12:45 a.m., Mr. Whiteru exited a metro train at the Judiciary Square station, "noticeably intoxicated."[1] *Id.* Around 1:07 a.m., he approached a kiosk on the station's mezzanine level and spoke with station manager Rhonda Brown, who helped him with his SmarTrip card. *Id.* He then walked down an escalator, which was in "stair mode," stumbling over the last few steps before falling. *Id.* Mr. Whiteru then attempted to lean or sit on a narrow parapet opposite the train tracks, the other side of which is an "uncovered trough that houses electrical and lighting equipment." *Id.* At around 1:15 a.m., Mr. Whiteru fell over the ledge and landed at the bottom of the trough, causing a spinal fracture, which "which immobilized him and compromised his breathing." *Id.* Mr. Whiteru ultimately and tragically died from asphyxiation, and his body was not

---

[1] Video footage captured parts of Mr. Whiteru's time in the metro station, including his fall down the escalator steps and his fall behind the parapet wall. *See Whiteru II*, 89 F.4th at 169.

discovered until four days later after a metro passenger alerted a station manager. *Id.*

As relevant here, WMATA's operating procedures required the station manager to perform visual inspections of the platform at 1:30 a.m., 2:30 a.m., and 3:15 a.m. *Id.* at 168-69. Appellants' experts opined that Mr. Whiteru would have remained conscious and able to call for help for at least three to four hours after he fell. *Id.* at 168. It is undisputed that Mr. Whiteru would have survived had he been discovered timely, but it is disputed whether Ms. Brown, the on-duty station manager, performed station inspections and whether those inspections included looking behind the ledge and into the trough. *Id.* at 169.

Mr. Whiteru's parents and his estate brought a negligence and wrongful death action against WMATA in the District Court for the District of Columbia, contending that WMATA negligently failed to discover Mr. Whiteru in time to provide life-saving aid. *See Whiteru v. Washington Metro. Area Transit Auth.*, 258 F. Supp. 3d 175, 177 (D.D.C. 2017). The district court denied WMATA's motion for summary judgment, concluding that WMATA was not entitled to sovereign immunity given the conduct at issue and that appellants had demonstrated a genuine dispute of material fact as to each element of a negligence claim. *Id.* at 193. The trial court scheduled the matter for trial. *Id.* at 178.

The trial court then allowed WMATA to submit supplemental summary judgment briefing. *See Whiteru v. Washington Metro. Area Transit Auth.*, 2018 WL 6605427, at *1 (D.D.C. Dec. 17, 2018). In supplemental briefing, WMATA raised a defense of contributory negligence, arguing that it is a complete bar to recovery with respect to Mr. Whiteru's claims. *See Whiteru v. Washington Metro. Area Transit Auth.*, 480 F. Supp. 3d 185, 188 (D.D.C. 2020). The district court agreed, highlighting that it "is undisputed that Whiteru was heavily intoxicated" when he entered the metro station and that "it was his own engagement with the station's parapet wall that caused him to fall 'head over feet' over the wall, and which ultimately resulted in his untimely death." *Id.* at 192. Thus, the district found that Mr. Whiteru had been contributorily negligent "as a matter of law." *Id.* The district court also rejected the argument that Section 314A of the Restatement (Second) of Torts, which states that a "common carrier" has a duty of reasonable care to its passengers even if the passenger negligently contributes to his or her own injury, bars a defense of contributory negligence. *Id.* at 195-96. The district court granted WMATA's supplemental motion for summary judgment. *See id.* at 198.

On appeal, the D.C. Circuit reversed and remanded. *See Whiteru v. Washington Metro. Area Transit Auth.*, 25 F.4th 1053, 1060 (D.C. Cir. 2022) (*Whiteru I*). The D.C. Circuit highlighted that this court has explicitly adopted Section 314A of the Restatement, which "recognizes the special relationship

between common carriers and passengers," even if a passenger negligently contributes to his or her own injury. *See id.* at 1058-59. The court explained: "The common law of the District allows for some exceptions to the strict application of contributory negligence. For instance, '[e]ven a contributorily negligent plaintiff may recover if the defendant had the 'last clear chance' to avoid the injury.'" *Id.* at 1059 (quoting *Asal v. Mina*, 247 A.3d 260, 271 n.11 (D.C. 2021)). "Common carrier liability pursuant to Section 314A of the Restatement is another such exception." *Id.*. The court explained that "[o]n the disputed facts, a reasonable jury could conclude that [station manager] Rhonda Brown failed to perform the routine inspections, or performed them unreasonably. Under those circumstances, WMATA could be liable for failing to aid Mr. Whiteru because it knew or had reason to know that he was injured." *Id.* at 1059. Therefore, the court concluded that "the District Court erred when it ruled that WMATA's contributory negligence defense was a complete bar to the Whiteru Estate's negligence claim." *Id.* The D.C. Circuit concluded that the record reflected genuine disputes of material fact as to whether WMATA breached its duty to render aid to Mr. Whiteru after his fall, whether the alleged breach aggravated Mr. Whiteru's injuries, and whether his conceded contributory negligence bars a negligence claim. *Id.* at 1060.

On remand, the district court summarized the question before it:

> This case turns on a close and nuanced question: was Whiteru a passenger or a trespasser during his time behind the parapet? Answering that question first determines the applicable duty of care. If Whiteru was a passenger, WMATA had a duty to aid him if it knew or should have known of his injury; if he was a trespasser, Defendant had no such duty. The answer also separately resolves whether contributory negligence bars recovery. If Whiteru was a passenger, Plaintiffs may still recover notwithstanding his negligence under an exception to D.C.'s contributory-negligence rule; if he was a trespasser, contributory negligence blocks his path.

*Whiteru v. Washington Metro. Area Transit Auth.*, 636 F. Supp. 3d 107, 111 (D.D.C. 2022). The court highlighted that "two very different standards govern common carriers' duties to passengers versus trespassers," pursuant to Section 314A of the Restatement (Second) of Torts, titled "Special Relations Giving Rise to Duty to Aid or Protect," and Section 329 of the Restatement, which defines "trespasser." *Id.* at 112-13. The district court explained that, under the first standard, "common carriers like WMATA have an affirmative duty to aid injured passengers," and in the second standard, "common carriers, like all property owners, do not have an affirmative duty to aid trespassers." *Id.* at 112.

The district court determined that Mr. Whiteru "lost his passenger status when he fell over the parapet" and thus, "WMATA owed Whiteru only the duty of care it owes to trespassers, which does not include a duty to aid." *Id.* at 111. Additionally, "the Court independently conclude[d] that the D.C. Circuit's interpretation of the

common-carrier exception does not allow for recovery given his contributory negligence." *Id.*

On appeal, the D.C. Circuit held that a question would be certified to this court: "We conclude that Whiteru's status—passenger or trespasser—which in turn determines WMATA's duty of care is an uncertain question of District of Columbia law for which there is no controlling precedent from the District of Columbia Court of Appeals (D.C. Court of Appeals).  We therefore certify the question to the D.C. Court of Appeals." *Whiteru II*, 89 F.4th at 168.  The D.C. Circuit briefly surveyed District case law regarding fare-paying customers who became trespassers; however, the court noted: "In all of these cases, the plaintiff sought to recover for serious injury or death that resulted from his having been struck by a train operating on the tracks after he voluntarily entered the tracks.  In none of them did the plaintiff seek to recover for the exacerbation of initial injuries caused by his *involuntary* entry onto the tracks; and none involved an area immediately adjacent to the portion of the station platform opposite the tracks." *Id.* at 169-71.  The D.C. Circuit concluded: "Faced with differing Restatement sections that are respectively silent as to each other and no case law on point, we refer the question to the D.C. Court of Appeals to define the boundary between trespasser and passenger status in this case." *Id.* at 171.

Appellants argue that they assert a claim under Section 314A, which arises from a failure "to render [Mr. Whiteru] aid *after* he became injured." Appellants argue that Mr. Whiteru's "special relationship" with WMATA continued after his inadvertent fall. They further argue that there is no controlling case on point; other plaintiffs "*forfeited* their passenger status by intentionally walking into the train tunnel or jumping onto the train tracks and . . . sought recovery for their *initial* injuries[.]" Appellants also argue that there are public policy and safety interests to support a rule that WMATA must render aid to passengers, even if they are in a restricted area. To hold otherwise, appellants argue, would reward WMATA for a failure to comply with its existing duty to perform reasonable station inspections. Appellants highlight that had the station manager performed station inspections, she would have timely discovered Mr. Whiteru.

Appellee contends that this case is controlled by the well-established D.C. tort law principle that a common carrier owes no special duty to a trespasser, regardless of how that person became a trespasser. Appellee highlights that trespassers can trespass "involuntarily" due to "incapacity, illness, and/or intoxication," but there is "no exception" in the Restatement or case law to the general trespasser rule for "accidental trespass." Appellee argues that WMATA was required to only refrain from "intentional, willful, or wanton conduct"—and did not have an affirmative duty to aid. Appellee argues that even if a greater duty of care applies to "known"

trespassers than to "unknown" trespassers, a landowner or common carrier must have actual knowledge that a trespasser is present. Here, appellee contends that WMATA did not actually know of Mr. Whiteru's presence in the trough. Therefore, appellee argues that appellants' negligence claim must fail.

### III.  Relevant Principles of Tort Law

The District of Columbia has adopted Section 314A of the Restatement (Second) of Torts, which defines "Special Relations Giving Rise to Duty to Aid or Protect." *See McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708, 712 (D.C. 1991). Generally, an actor does not have a duty to act even if the "actor realizes or should realize that action on his part is necessary for another's aid or protection." Restatement (Second) of Torts § 314. However, "[s]pecial relations may exist between the actor and the other, as stated in § 314A, which impose upon the actor the duty to take affirmative precautions for the aid or protection of the other." *Id.* cmt. a.

As relevant here, Section 314A states:

> (1) A common carrier is under a duty to its passengers to take reasonable action
> > (a) to protect them against unreasonable risk of physical harm, and
> > (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

"A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation." *Id.* at § 314A(3).[2]

Therefore, we have said that "WMATA, like any common carrier, owes a duty of reasonable care to its passengers." *McKethean*, 588 A.2d at 712. That reasonable care includes a duty "to give [passengers] aid after it knows or has reason to know that they are ill or injured[.]" Restatement (Second) of Torts § 314A(1)(b). But a "common carrier has no special duty to non-passengers." *McKethean*, 588 A.2d at 712 (citing Restatement (Second) of Torts § 314A, cmt. c; Standardized Civil Jury Instructions, No. 8.2). "[U]ntil a person has placed himself in some substantial sense in the custody or under the control of the carrier, he is not a passenger and no special duty of care is owed him." *Baker v. D.C. Transit Sys., Inc.*, 248 A.2d 829, 831 (D.C. 1969).[3] Similarly, a "carrier is under no duty to one who has left the vehicle and ceased to be a passenger[.]" Restatement (Second) of Torts § 314A cmt. c.

---

[2] We refer to "common carriers" and "landowners" throughout this opinion, as similar principles of tort law apply to common carriers and landowners. *See, e.g.*, Restatement (Second) of Torts § 314A(1), (3); *see also Whiteru II*, 89 F.4th at 169 (analyzing common carrier and land possessor principles as applied to WMATA).

[3] Decisions of the D.C. Circuit prior to February 1, 1971, are binding on this court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

The District of Columbia has also adopted Section 329 of the Restatement, which defines "trespasser." *See Firfer v. United States*, 208 F.2d 524, 528 (D.C. Cir. 1953). "A trespasser is a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329; *see also Lacy v. Sutton Place Condo. Ass'n, Inc.*, 684 A.2d 390, 393 (D.C. 1996) ("A trespasser is one who enters or remains upon property in the possession of another without the consent of the possessor."). Someone may become a trespasser, despite being originally invited on the premises, when he or she "exceed[s] the scope" of an invitation. *Firfer*, 208 F.2d at 529.[4]

"Trespassers may only recover for 'intentional, wanton or willful injury or maintenance of a hidden engine of destruction.'" *Holland v. Baltimore & O. R. Co.*, 431 A.2d 597, 599 (D.C. 1981) (en banc) (quoting *Firfer*, 208 F.2d at 528); *see also Boyrie v. E & G Prop. Servs.*, 58 A.3d 475, 477 (D.C. 2013) ("A landowner generally does not owe a duty of reasonable care to trespassers."). However, "[o]nce the presence of a trespasser is known, the [landowner] must exercise ordinary care not

---

[4] "In *Firfer*, the court distinguished between the duties owed by a landowner to licensees, invitees, and trespassers. The distinct standards of care for licensees and invitees under the common law no longer exist in this jurisdiction. The standard of care for persons *lawfully* upon the premises is reasonable care under the circumstances." *Lacy*, 684 A.2d at 393 n.2 (citations omitted) (emphasis in original).

to injure the trespasser." *Copeland v. Baltimore & O. R. Co.*, 416 A.2d 1, 3 (D.C. 1980).

## IV. Discussion

The "duty owed and the degree of care required to be exercised by the landowner in turn depend upon the status of the injured person at the time of the accident[.]" *Firfer*, 208 F.2d at 527. We repeat here the undisputed facts from the district court to aid in our analysis:

> The parties do not dispute that Whiteru was a passenger while on the station platform before his fall. They also do not dispute that the area behind the parapet wall is not typically held open to Metro passengers, the normal divide for when a licensee becomes a trespasser. Finally, they agree that the relevant injury here is the exacerbation of the initial wounds Whiteru sustained when he fell behind the parapet wall because Plaintiffs' cause of action here relates only to WMATA's failure to aid him while he was in that area.

*Whiteru*, 636 F. Supp. 3d at 112 (internal citations omitted). The current case contains facts that distinguish it from our other reported cases. Mr. Whiteru was undisputedly a passenger on WMATA's premises when he was on the platform; he had gone through the turnstile and paid for a trip. *See McKethean*, 588 A.2d at 712 (holding that there was no "special duty" to "prospective passengers" injured while waiting for a bus).

To summarize the discussion that follows, our case law demands that we find that a passenger becomes a trespasser after falling into a non-public area, despite the "trespass" being accidental and unintentional. However, the exact duty owed to such a trespasser is fact-dependent. If the trespasser was undiscovered or unknown, the landowner or common carrier would only owe a duty to refrain from willfully or wantonly injuring him or her. If the trespasser had been discovered or known, the landowner or common carrier would owe a duty of ordinary care to avoid injuring him or her. Similarly, we explain that as a corollary to that duty, if the landowner or common carrier had knowledge of the trespasser's injuries, trapped, or imperiled status, it would be required to provide reasonable affirmative aid to the trespasser.

## A. Status

The first question is whether Mr. Whiteru was a "passenger" or a "trespasser." Appellants argue that Mr. Whiteru remained a "paying customer, invited by WMATA into its Metro Station and standing on the platform intended for waiting passengers" and that "nothing severed Mr. Whiteru's special relationship with WMATA[.]" Appellee argues that a "passenger who enters an off-limits area in a train station becomes a trespasser" because the person "exceeded the scope of his license[.]" We agree that Mr. Whiteru became a trespasser when he fell over the

wall into the non-public area, despite previously being a passenger and despite the trespass being unintentional.

A "trespasser is one 'who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise.'" *Toomer v. William C. Smith & Co.*, 112 A.3d 324, 328 (D.C. 2015) (quoting *Boyrie*, 58 A.3d at 477-78) (emphasis omitted). A person legally on the premises may become a "trespasser" by exceeding the "scope and the chronological and geographical limits of the invitation." *Firfer*, 208 F.2d at 527. In *Firfer*, the court explained that a plaintiff "became a trespasser," though he was initially in an area open to the public, because he "left that portion of the [] grounds which is set aside for the public[.]" *Id.* at 529. The plaintiff could not recover for injuries because "when the accident happened [he was] not in a place where the public generally was invited and welcomed." *Id.* at 528.

An accidental, unintentional, or involuntary trespasser is still a trespasser. *See Copeland*, 416 A.2d at 3; *see also* Restatement (Second) of Torts § 329 cmt. c ("In determining whether the person who enters or remains on land is a trespasser within the meaning of this Section, the question whether his entry has been intentional, negligent, or purely accidental is not material, except as it may bear upon the existence of a privilege to enter."). Our case law shows that even nonvolitional entry

can render a person a trespasser. In *Copeland*, 416 A.2d at 2, the plaintiff "had been placed on the tracks by one or more unknown persons, who took him from his front porch and while Copeland was semiconscious, transported him in an automobile to the tracks." We explained that Copeland was a trespasser because he "did not have permission to be on the tracks," even though he was not "there by any volitional act on his part[.]" *Id.* We explained that the trespasser definition "applies regardless of how the person entered the premises (accidentally, intentionally, or inadvertently), or why the person remained on the property." *Id.* at 3.

Similarly, someone may trespass even if there was no explicit warning they were leaving a space to which they were invited. In *Firfer*, 208 F.2d at 528-29, the court explained that the plaintiff had sufficient warning that he was leaving the area to which he was invited, despite no warning signs being posted to cabin off the area open to the public from the area prohibited to the public. The court explained that the "fact that no warning signals were posted . . . is of no significance since the natural and artificial obstacles to an entry onto the grassy plot area were warning enough in themselves." Similarly, in *Lacy*, 684 A.2d at 394, the court explained that a "mistake of fact" that a person was invited to enter a prohibited space "does not alter [their] status as a trespasser[.]"

Furthermore, we see no analytical distinction between one who was formerly an invitee and one who was formerly a passenger; the trespasser definition applies after a person enters an area without "the possessor's consent or otherwise." *Boyrie*, 58 A.3d at 477-78. Therefore, under our case law, a passenger may become a trespasser by leaving the area held open to him or her, regardless of the manner of how he or she left or his or her state of mind at the time.

Federal cases applying District of Columbia tort law align with the principle that a passenger may involuntarily become a trespasser. *See, e.g., Hines v. Washington Metro. Area Transit Auth.*, 2022 WL 392306, at *1 (D.D.C. Feb. 9, 2022), *on reconsideration in part*, 2022 WL 2176924 (D.D.C. June 16, 2022) (holding that an elderly passenger suffering from "brain atrophy with senile changes" became a trespasser after she "passed through an unmarked gate and walked onto the train tracks"); *Coulston v. Washington Metro. Area Transit Auth.*, 2020 WL 1236563, at *2 (D.D.C. Mar. 13, 2020) (holding that a passenger with a history of mental illness and depression "became a trespasser when he left the station platform and climbed down onto the tracks").[5]

---

[5] Appellants point to *Harris v. Washington Metro. Area Transit Auth.*, 490 F. Supp. 3d 295 (D.D.C. 2020), as an example in their favor because the court there determined a genuine dispute of material fact precluded summary judgment as to whether the plaintiff was a passenger or a trespasser. In *Harris*, an injured plaintiff entered a Metro station forty minutes after the station was closed. *Id.* at 315. The

Illustration 1 of Section 329 also illuminates the principle that a trespass may be accidental and may occur even if a person was initially lawfully on the premises as a passenger. The illustration states:

> Without any negligence on his part A, standing on the platform of a subway station of the X Company, slips and falls onto the tracks. While there he is run over by the train of X Company, and injured. A is a trespasser, and the liability to him is determined by the rules stated in §§ 333 and 336, notwithstanding the accidental character of his intrusion.

Illustration 1 is based on *Frederick v. Philadelphia Rapid Transit Co.*, 10 A.2d 576, 578 (Pa. 1940), in which a passenger fell while walking along the subway platform onto the track and into the path of the train. The court explained that because the

---

court determined that a "reasonable juror could conclude that [the plaintiff] was lawfully present at the Metro station" because the escalators were still operating and the station had no hours of operation posted outside. *Id.* at 316. The court explained that WMATA may have had a "*special* duty" to the plaintiff, as both a common carrier and land possessor, based on outward indications that the station was still open to the public. *Id.* The court determined that the "issue of whether a person had implied authorization to enter a place of business after closing time is typically an appropriate question for the jury." *Id.* at 315.

We do not think the *Harris* case supports the principle that Section 314A can apply in an even "more attenuated special relationship" than here, as appellants argue; instead, it stands for the principle that "implied authorization" to enter a premises could render a person an invitee or a passenger who is owed a duty. *See id.* at 315; *see also Boyrie*, 58 A.3d at 478 ("Authorization to enter property can be express or implied."). There is no argument here that Mr. Whiteru had implied authorization to enter the trough or that his entry was in any way consented to by WMATA.

plaintiff "was not invited, and his appearance was not to be anticipated, the extent of defendant's obligation toward him was no greater than if he were a trespasser." *Id.*

The *Frederick* case is illustrative of the principle that a passenger may become a trespasser, even by accident or otherwise unintentionally. This example brings together several long-held principles from our case law—that one becomes a trespasser when one exceeds the scope of the license, *see Firfer*, 208 F.2d at 528-29, even if accidentally or inadvertently or without volition, *see Lacy*, 684 A.2d at 394; *Copeland*, 416 A.2d at 3, and even if, immediately prior, the person was lawfully on the premises, *see Firfer*, 208 F.2d at 528.

Appellants rely on Illustration 1 of Section 314A, which says:

> A, a passenger on the train of B Railroad, negligently falls off of the train, and is injured. The train crew discover that he has fallen off, but do nothing to send aid to him, or to notify others to do so. A lies unconscious by the side of the track in a cold rain for several hours, as a result of which his original injuries are seriously aggravated. B Railroad is subject to liability to A for the aggravation of his injuries.

Appellants argue that this illustration "provides that common carrier 'B' owed special relationship duties to passenger 'A' *after* he fell off a train and needed aid *while lying injured beside the tracks*." At first glance, the facts in this illustration look similar to the illustration in Section 329 and the facts at hand. However, this

illustration, which the Restatement characterizes as a "passenger injured through his own negligence," does not deal with the issue of trespass; instead, its focus is on whether a common carrier has a duty to aid a passenger "injured through his own negligence"—not the line between passenger and trespasser.[6]  *See* Restatement (Second) of Torts § 314A Reporter's Notes.  This illustration is based on several cases where trespass was not an issue; instead, the courts were deciding whether a plaintiff could recover even if he or she was injured in part due to his or her own negligence.[7]

---

[6] The district court came to this same conclusion in its analysis.  *See Whiteru*, 636 F. Supp. 3d. at 114 (explaining that "§ 329 is squarely aimed at the line between trespasser and passenger; by contrast, § 314A focuses instead on the nature of the duties a common carrier owes its passengers *when those duties apply*.  The § 314A illustration does not mention anything about whether the passenger was a trespasser in the area in which he landed.  That makes sense, as the short illustration is simply not focused on (and so does not consider) the issue of potential trespass.") (emphasis in original).

[7] The facts in the illustration were directly based on *Yazoo & M.V.R. Co. v. Byrd*, 42 So. 286, 287 (Miss. 1906), in which other passengers immediately spotted that a passenger had been thrown from a train and informed the conductor, who refused to stop.  The issue of trespass was never raised; instead, the court focused on whether the defendant railroad may have overcrowded its trains and forced its passengers to obtain seating in unsafe places, which could lead to liability for refusing to help the passenger, despite any contributory negligence.  The court explained: "Appellant cannot overcrowd its cars with passengers, making it impossible to obtain seats in safe places, and excuse itself from liability by saying a passenger under these circumstances was riding in a dangerous place." *Id.*

The other cases cited in support of the illustration dealt with duty to aid passengers, despite their own alleged negligence, when the common carrier is aware

Thus, we disagree with appellants that "nothing severed Mr. Whiteru's special relationship with WMATA" and that "Mr. Whiteru was still a passenger[.]" Mr. Whiteru's fall in a non-public area, while accidental and inadvertent, severed the special passenger relationship that he undisputedly had with WMATA before his fall, just like the passenger-turned-trespasser in *Frederick*.

We also disagree with appellants' argument that this case is distinguishable from other case law in which a passenger "forfeited" their status by entering the tracks. In *Copeland*, 416 A.2d at 3, we explained that the trespasser definition applies "regardless of how the person entered the premises" or "why the person remained on the property." Similarly, we reject the argument that these other cases are distinguishable because the plaintiffs "were never passengers to begin with." Applying *Firfer*'s principle here, exceeding the scope of a license puts one in the

---

of the passenger's plight. Two of these cited cases dealt with the duty to help passengers with physical or mental disabilities alight from trains if the carrier was alerted to them. *See Layne v. Chicago & A.R. Co.*, 157 S.W. 850, 853 (Mo. 1913); *Yu v. New York, N. H. & H. R. Co.*, 144 A.2d 56, 57 (Conn. 1958). The other case explained the "well-settled rule of the law of negligence" that a defendant may be liable for failing to use ordinary care to avoid injuring a plaintiff that the defendant knew was in danger, despite the plaintiff's own negligence. *See Cincinnati, H. & D. R. Co. v. Kassen*, 31 N.E. 282, 284 (1892), *overruled by Cleveland Ry. Co. v. Masterson*, 183 N.E. 873 (1932). One case dealt with a plaintiff injured while on a bus who notified the driver and requested medical attention, but the bus driver failed to provide aid. *See Cont'l S. Lines, Inc. v. Robertson*, 133 So. 2d 543, 545 (Miss. 1961).

trespasser category, even if one was initially on the premises lawfully as a passenger. *See also Frederick*, 10 A.2d at 578. Here, while Mr. Whiteru was initially undisputedly a passenger, he left the area held open to him and became a trespasser by his fall into the non-public area.

## B. Duty

Concluding that Mr. Whiteru was a trespasser does not end the inquiry. Appellants argue that a "technical" trespass should not resolve the analysis because Mr. Whiteru's "special relationship" with WMATA continued after his fall. Appellants argue that we should adopt a rule that WMATA must "render aid to its passengers even when their injury lands them in a restricted area" because of "common-sense public-policy and safety interests." Appellants argue that such a rule would "incentivize WMATA to comply with its already existing duty to inspect its stations, rather than rewarding WMATA for its failure to discover Mr. Whiteru."

Appellee argues that common carriers owe trespassers only "a duty to refrain from intentional, willful, or wanton conduct" as a general rule; any higher duty to a trespasser applies only in narrow circumstances. Appellee also argues that, even assuming arguendo a higher duty applies to "known" or "discovered" trespassers, the landowner must "know or have reason to know" of the *actual* presence of the

trespasser. Appellee argues that there is "no duty to aid an unknown passenger-turned-trespasser."

We agree with appellee that Section 314A's special duty to affirmatively aid does not apply to a situation where a passenger has become a trespasser, even if that act resulting in the passenger becoming a trespasser was inadvertent. *See* Restatement (Second) of Torts § 314A cmt. c (The special duty does not apply to one who has "ceased to be a passenger," just as it does not apply to "one who has ceased to be an invitee"). However, the general rule that landowners only owe a duty to refrain from willfully or wantonly injuring trespassers has an exception for known trespassers: a landowner owes a "discovered" trespasser, or a trespasser that is known or seen by the landowner, a duty of ordinary care to avoid injuring them. *See Copeland*, 416 A.2d at 3. Further, as we explain, a corollary to that rule is that a landowner also owes to known trespassers a duty of reasonable affirmative action, which may include aid.

### 1. The general rule

Generally, "[t]respassers may only recover for 'intentional, wanton or willful injury or maintenance of a hidden engine of destruction.'" *Holland*, 431 A.2d at 599 (quoting *Firfer*, 208 F.2d at 528); *see also* Restatement (Second) of Torts § 333 (The general rule is that "a possessor of land is not liable to trespassers for physical harm

caused by his failure to exercise reasonable care (a) to put the land in a condition reasonably safe for their reception, or (b) to carry on his activities so as not to endanger them."). "Willful" or "wanton" conduct is generally characterized as reckless disregard for the rights of others. *See Copeland*, 416 A.2d at 3-4. An "entire course of conduct" by a land possessor can show evidence "from which a jury could find that the [possessor] willfully or wantonly injured" a trespasser. *Id.*

### 2. Known trespassers

Our case law, other jurisdictions, and the Restatement apply a different duty if a trespasser is "known" or "discovered." *See* Restatement (Second) of Torts § 336 cmt. d ("[A] possessor is under a duty to exercise care for the safety of trespassers after he knows, or from facts within his knowledge should know or believe, that they are or may be upon his land[.]"). In *Copeland*, 416 A.2d at 3, we explained that the "generally accepted" standard is that "[o]nce the presence of a trespasser is known, the railroad must exercise ordinary care not to injure the trespasser." *Id.* We explained: "If by the exercise of ordinary care injury can be avoided, the defendant is liable for the failure to use such care[.]" *Id.* (quoting *Bremer v. Lake Erie & W. R. Co.*, 148 N.E. 862 (1925)); *see also Frederick*, 10 A.2d at 578 (holding that "when the owner or operator is put on guard as to the presence of the trespasser, the latter immediately acquires the right to proper protection under the circumstances"); *Gladon v. Greater Cleveland Reg'l Transit Auth.*, 662 N.E.2d 287, 293 (Ohio 1996)

("When a trespasser or licensee is discovered in a position of peril, a landowner is required to use ordinary care to avoid injuring him.").

Other courts have clarified that, as part of this duty to use ordinary care to prevent initial or further injury towards a known trespasser, there is a "duty to take reasonable affirmative action[.]" *See Pridgen v. Bos. Hous. Auth.*, 308 N.E.2d 467, 477 (Mass. 1974). In *Pridgen*, an 11-year-old trespasser became trapped in an elevator shaft and suffered severe injuries after the elevator crushed him. *Id.* at 470. A maintenance worker had been alerted to the child's presence and had ignored requests to turn off the electricity before the injury occurred. *See id.* at 478. The court explained that a landowner may not only have a duty to avoid injuring a trapped trespasser but also, in limited circumstances, owe a duty of affirmative action:

> This is not a case of an intruder who is cut during the act of pushing his fis[t] through the glass in a door which the owner has no[] duty to open for him; rather, we are dealing with one who is injured after his original trespass is effectively frustrated by virtual physical entrapment in a position of peril. We hold that as to the latter trespasser the owner owes a duty to exercise reasonable care to prevent injury or further injury to him, including, if necessary, the duty to take reasonable affirmative action.

*Id.* at 477. The *Pridgen* court explained that it "reject[ed] any rule which would exempt the owner from liability if he knowingly refrains from taking reasonable action which he is in a position to take and which would prevent injury or further

injury to the trespasser." *Id.* at 476. The court stressed that "[i]t should not be, it cannot be, and surely it is not now the law . . . that the owner in such a situation is rewarded with immunity from liability as long as he ignores the plight of the trapped trespasser and takes no affirmative action to help him." *Id.*[8]

Based on these considerations, we think it makes good sense to clarify the rule put forth in *Copeland* regarding known trespassers. Known trespassers are owed an ordinary duty of care, which may include an affirmative duty to aid in circumstances

---

[8] Comment c of Section 314 of the Restatement expresses similar unease with such a rule:

> The origin of the rule lay in the early common law distinction between action and inaction, or "misfeasance" and "non-feasance." . . . . Hence, liability for non-feasance was slow to receive any recognition in the law. It appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff.
>
> The result of the rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule.

where the landowner has actual knowledge that the trespasser is injured, trapped, or otherwise imperiled. This duty requires reasonable action, which the landowner is in a position to take, and which may prevent injury or exacerbation of injury to the known trespasser. Such a rule makes sense as a corollary to the duty to act with ordinary care towards a known trespasser. Additionally, from a policy perspective, it would make little sense to require a landowner to use ordinary care to avoid injuring a discovered trespasser but to also allow the landowner to escape liability when ignoring a known injured, trapped, or otherwise imperiled trespasser. *See Szymkowicz v. President & Directors of Coll. of Georgetown Univ.*, 336 A.3d 650, 655 (D.C. 2025) (existence of a duty is based on a variety of circumstances including policy decisions made by the courts and the legislatures). Therefore, once a common carrier or land possessor discovers or knows of the presence of a trespasser who is trapped or injured and requires aid, it may not ignore the trespasser's peril.[9]

The "knowledge" standard requires either actual knowledge or "reason to know of the presence" of a trespasser. *See* Restatement (Second) of Torts § 336. There must be "facts within [a land possessor's] knowledge" that there is a

---

[9] For this reason, we disagree with the district court's assertion that "common carriers do not owe trespassers, known or unknown, an affirmative duty to aid." *Whiteru*, 636 F. Supp. 3d at 112 .

trespasser. *See* Restatement (Second) of Torts § 336 cmt. d. As the court in

*Frederick*, 10 A.2d at 578, explained:

> What constitutes sufficient notice of a trespasser's exposure to a situation of peril necessarily depends upon the facts in each instance. Most of the decided cases have been concerned with the question whether the trespasser was seen by the person sought to be charged with negligence . . . . Notification may also come from an apparently trustworthy person who is himself an eye-witness. [10]

Importantly, however, a landowner is not required to anticipate or search for

trespassers. *See* Restatement (Second) of Torts § 336, cmt. d. As the court in

*Bremer*, 148 N.E. at 864, explained, "the defendant is not bound to anticipate the

presence of trespassers on its property or to keep a lookout for them, and . . . its duty

to exercise care to avoid injury to trespassers begins only when their presence is

known." *See also Sabo v. Reading Co.*, 244 F.2d 692, 694 (3d Cir. 1957) ("To justify

recovery, it must appear that the engineer actually discovered the presence of the

---

[10] Similarly, Section 336 of the Restatement explains that there could be facts that give rise to a "cause to suspect" there is a trespasser. Illustration 1 explains: "The engineer of the X & Y Railroad Company sees lying upon the track a pile of clothing such as would give a reasonable man cause to suspect that it might contain a human being. Under these circumstances the engineer is not entitled to assume that it is not a human being but is required to keep the engine under control until he is certain that it is not."

trespasser, and thereafter failed to exercise due care to avoid strik[i]ng him. It is not enough that the engineer simply failed to keep a lookout for the trespasser.").

This analytical framework, in which a landowner or common carrier has a duty of care to a known trespasser, fits with Illustration 1 of Section 314A. In that illustration, a train company is subject to liability after a passenger is seen falling off a train onto the side of the tracks and failing to send aid. Similarly, this framework also fits with appellants' example, in which they urge the court to hold that a guest who "accidentally falls into a fountain in the hotel lobby, becoming injured and requiring aid" is surely owed an affirmative duty to aid, despite the guest falling into a "restricted" area. In both examples, the former passenger or guest is owed an affirmative duty to aid, even if technically a "trespasser," if the common carrier or landowner has knowledge that the trespasser is injured, trapped, or otherwise in danger, such as by employees directly seeing the fall or being directly informed of the fall by other passengers or guests.

However, we disagree with appellants' argument that a common carrier has a duty to aid if it "should have known" of a trespasser's presence or plight. We agree with appellee that a "should have known" standard is not sufficient for the duty to apply. As stated, the standard for "knowledge" or "reason to know" of a trespasser is not a "should have known" standard; instead, the duty requires actual knowledge

of the trespasser, or knowledge of facts that would give rise to the knowledge or belief that there is a trespasser. "Reason to know" means that there were facts within the knowledge of the common carrier that provided the common carrier with a basis for believing that a trespasser is present. In contrast, a "should have known" standard would impose knowledge of a trespasser if the common carrier would have discovered the trespasser through the exercise of reasonable care. Such a standard would effectively transform the duty to known trespassers into an ordinary duty of care towards all upon the premises, lawfully or not. This jurisdiction has explicitly declined to adopt such a framework, and we still recognize distinctions between those lawfully upon the premises and those not. *See Holland*, 431 A.2d at 601; *see also Lacy*, 684 A.2d at 393 n.2.

Appellee contends that it is "undisputed here that Whiteru's presence in an off-limits trough below the platform was *unknown*." Appellants contend that the "district court found that there is a genuine factual dispute as to whether WMATA *should have known* of Mr. Whiteru's injuries[,]" citing a factual dispute over whether the station manager performed reasonable inspections of the platform that could have included looking into the trough. *See Whiteru I*, 25 F.4th at 1058-59; *Whiteru II*, 89 F.4th at 169. While we do not decide whether the required knowledge standard was met here, we emphasize that a landowner is not bound to inspect or keep a look

out for trespassers, unless the landowner has reason to know that a trespasser is in a non-public part of its property.[11]

Therefore, we answer the D.C. Circuit's question in the affirmative. Overall, a common carrier who knows or has reason to know of a trespasser's presence, injuries, or imperiled status may be subject to liability for physical harm caused by the common carrier's failure to act with reasonable care for the trespasser's safety. *See* Restatement (Second) of Torts § 336 cmt. d.[12]

## V.  Conclusion

In summary, a passenger who accidentally or unintentionally falls into a non-public area is a trespasser. However, if the common carrier knows, or has reason to

---

[11] Illustration 4 of Section 336 of the Restatement (Second) of Torts explains that a railroad's liability to a trespasser struck on the tracks would not stem from the railroad's "failure to keep a lookout" for trespassers; instead, it would stem from whether the trespasser had been actually seen by the railroad company. This illustration is based on *Chicago Terminal Transfer Co. v. Kotoski*, 65 N.E. 350, 352 (Ill. 1902), in which the court explained: "We do not hold that it was the duty of the trainmen to anticipate the presence of trespassers on the tracks or to keep a lookout for them, but we do hold that when they knew that persons were there they had no right to willfully run them down and inflict injury upon them."

[12] We express no opinion on whether the required "knowledge" standard was met here and leave it to the federal court to apply the principles outlined in this opinion. We also express no opinion on issues related to contributory negligence, as they are outside the scope of the question certified.

know through facts in its knowledge,[13] that the trespasser is injured, trapped, or otherwise imperiled, the common carrier has a duty to exercise ordinary care to prevent initial or further injury to the trespasser, including the duty to take reasonable affirmative action, which may include aid.

*So ordered.*

---

[13] As we explained, *supra* pp. 30-31, the "reason to know" standard differs from a "should have known" standard, which imputes knowledge that the landowner or common carrier would have possessed had the common carrier or landowner acted with reasonable care. "Reason to know" means that there were facts within the knowledge of the common carrier that provided the common carrier with a basis for believing that a trespasser is present.